IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PRESERVATION WELLNESS TECHNOLOGIES, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>ALLSCRIPTS HEALTHCARE SOLUTIONS, INC.,<br><br>       Defendant. | )<br>)<br>)<br>)<br>) Case No. 2:15-cv-01559<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>) |
| PRESERVATION WELLNESS TECHNOLOGIES, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>EPIC SYSTEMS CORPORATION,<br><br>       Defendant. | )<br>)<br>)<br>)<br>) Case No. 2:15-cv-01561<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
MOTION TO DISMISS COMPLAINT UNDER 35 U.S.C. § 101**

Plaintiff Preservation Wellness Technologies, LLC ("Preservation Wellness" or "Plaintiff"), hereby files this Response in Opposition to the Motion to Dismiss of Epic Systems Corporation ("Epic" or "Defendant") Plaintiff's Complaint Under 35 U.S.C. § 101 ("Motion"). In its Motion, Epic erroneously contends that all claims of the patent-in-suit, U.S. Patent No. 7,640,271 ("'271 Patent"), are invalid for failing to claim patentable subject matter under § 101 and thus Preservation Wellness' Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  As Preservation Wellness respectfully shows below, the Court should deny the Motion because, when all

reasonable inferences are drawn in favor of Plaintiff, the '271 Patent claims patent eligible subject matter in each claim.  Alternatively, the Court should defer ruling on the § 101 issues, because there is a dispute as to the meaning of at least one, if not more, claim terms relevant to the patentable subject matter question.

## I.      INTRODUCTION

In two independent claims and 17 dependent claims, the '271 Patent claims a specific and particular way of implementing an electronic medical records system remotely accessible to both doctors and patients.  Contrary to Epic's assertions, the '271 Patent is not simply "directed to the abstract idea of collecting, accessing and managing patient medical records in a secure manner." The '271 Patent begins from the foundation of electronic medical records and solves certain technical issues in then existing electronic medical records systems to provide both doctors and patients with editable access to the same body of medical records in real-time from decentralized locations, but through different screens that filter the information displayed depending on the user.  As we explain below, in the independent claims (Claims 1 and 16), these features include specific software to provide different "data modules" to patients and doctors, and a "two-way firewall program" to provide this distinct information.  And Claim 14 further provides physicians with "a feature permitting the physician to override the firewall feature . . . for a limited time." These claim terms, when properly construed, taken independently and as part of each claim as a whole, demonstrate that the subject matter claimed in the '271 Patent is not abstract and, even if it were, the claims contain a sufficient "inventive concept" to meet the requirements of § 101.

## II.     THE '271 PATENT AND ITS FILE HISTORY

The '271 Patent, entitled "System for Maintaining Patient Medical Records for Participating Patients," was duly and lawfully issued by the U.S. Patent and Trademark Office ("USPTO") on December 29, 2009. *See* Dkt. 1-1, '271 Patent at 1.  Claims 1 and 16 are

independent claims, and both claim a particular "system for maintaining patient medical records for a plurality of participating patients," not simply any such system. *Id.* at Col. 14-15 & Col. 16-17. The claimed system provides for remote access for patients and physicians "for reading and editing" the records and displays different screens and information to the patients and physicians, depending on the type of user. *Id.* The system uses, among other things, certain arguably conventional computer components, including a wide area computer network, patient and physician access computer devices, a web browser, a server, a computer device for connecting with the network, and a memory for storing the patient medical records. *Id.* Importantly, however, the claimed system also includes other components that either are not conventional or, if conventional, are used in unconventional and inventive ways. Complaint at ¶¶ 9-10. These unconventional elements include a particular kind of "software [for] providing data modules" of a specific type to a user's computer, as well as "a two-way firewall program" that facilitates the provision of the specific type of data modules to the corresponding type of user, as set forth in the claims.[1] *Id.*

Contrary to Epic's position, the software used by the system is not generic, off-the-shelf software, but rather software programs specifically designed to provide certain information to doctors and certain, different information to patients. *Id.* This software has two components – the "software providing data modules" and the "two-way firewall program" which work together to provide particular information to certain users. The details of what information is provided to each type of user are set forth in the specification and the claims, including the dependent claims. *See* '271 Patent. Indeed, in the prosecution of the patent, the examiner required that the final

---

[1] In the Complaint and this brief, Preservation Wellness offers several terms whose construction is material to the § 101 analysis. This is not intended to exhaust all possible terms that may be relevant to the analysis. As the case progresses, including further briefing on this issue, as well as infringement and invalidity contentions and claim construction, the construction of other terms may also become relevant.

element of each independent claim be added specifically to call out the requirements of the system that at least one physician screen include information, such as notes, that does not appear on the comparable patient screen. *Sept. 10, 2009 Interview Summary, Detailed Action, at 1, 5 & 7-9.* In allowing the patent to issue, the examiner found that the two-way firewall, which regulates the information shared through the software providing data modules with patient and doctor through these different screens, did not exist in other electronic medical records systems or other relevant prior art at the time. *Id.* at 7-9.

Contrary to Epic's arguments, both the specification and the file history teach that the two-way firewall program is more than simply a conventional password or access tool. Complaint at ¶¶ 9-10. First, the claims specify that "authorized persons" have access to the system, which is stated separately from the element of the "two-way firewall" (compare '271 Patent, col. 14, lns. 31-32 with col. 14, ln. 61 – col. 15, ln. 2). Similarly, in the specification, the password/pin login is described separately from the two-way firewall (compare '271 Patent, col. 8 lns. 33-36 & lns. 61-64 with col. 11, lns. 46-58). In the file history, one sees that the examiner initially found that the application was obvious in light of the Westfall reference, and that the user ID and password limitation of Westfall, at least in part, satisfied the "two-way firewall program" element. *See, e.g.,* Initial Office Action dated May 6, 2008. By the end of the prosecution, however, the examiner found not only that Westfall failed, alone, to show the two-way firewall program element, but also the other references he cited, Lindberg (first discussed in the Office Action dated August 6, 2008) and Moshfeighi (first discussed in non-final Office Action after amendment dated December 31, 2008), did not render the patent obvious in combination with Westfall because they were missing the claimed "two-way firewall program." Sept. 10, 2009 Interview Summary at 7-9. The examiner allowed the '271 Patent to issue

because, among other things, the "two-way firewall program" was not simply the password system disclosed in Westfall, Lindberg, and Moshfeighi. *Id.*

As noted, the claimed two-way firewall program is not a conventional firewall. Complaint at ¶¶ 9-10.   Expert evidence will show that a conventional firewall is designed to allow or block categories of information or types of programs from entering (or in the case of a two-way firewall leaving) the network.   Conventional firewalls do not authenticate or provide access to individual users, or otherwise control access to information by individual users.   Thus, the two-way firewall program claimed in the '271 Patent is not a conventional computer component, but either a unique program or, at a minimum, a specific adaptation of a traditional firewall program. *Id.*

Similarly, Claim 14 adds an additional feature to the computer elements claimed in the '271 Patent.  '271 Patent at Col. 16.   Claim 14 includes "a feature permitting the physician to override the firewall feature . . . for a limited time."   Again this is not a conventional computer component, but a specific part of the two-way firewall program designed to work with the claimed system and allows a patient to have controlled remote access to physician notes or other previously withheld medical records.   Complaint at ¶ 11.

## III.   ARGUMENT

### A.   Relevant Legal Standards

#### 1.   Standards for Deciding a Rule 12(b)(6) Motion to Dismiss

On a Rule 12 motion, the Court must "accept[] all well pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).   The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-movant. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). Detailed factual allegations are not required, but facts must be pled that, when

accepted as true, state a claim for relief that is "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

Here, as will be shown below in detail, Preservation Wellness has articulated plausible arguments in its Complaint supporting its position that the claimed invention meets the standards for patentable subject matter under § 101, specifically that (1) the claimed invention is not directed to an abstract concept, but rather at least "describe[s] a solution necessarily rooted in computer technology to solve a problem specifically arising in the realm of providing selective and secure access to electronic health records (or other confidential information)"; and (2) each claim contains at least one inventive concept – a "two-way firewall program," which is not a conventional two-way firewall program.  Complaint at ¶¶ 9-10.  Further, dependent claims such as Claims 14 and 19, add additional specific limitations that are also part of the inventive concept.  *Id.* at ¶ 11.  Given that all reasonable inferences must be drawn in its favor in deciding this Motion, Preservation Wellness respectfully submits that, on the basis of the Complaint alone, this Motion should be denied.  Should the Court choose to proceed further, however, Preservation Wellness presents the additional arguments, below.

## 2.    Standards for Patentable Subject Matter Under 35 U.S.C. § 101

Under applicable precedent, especially the U.S. Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. ___, 134 S. Ct. 2347 (2014), a court faced with a challenge to the patent's subject matter eligibility under § 101 must, determine (1) whether the claims of the patent are directed to, *inter alia*, an abstract idea (one of the "patent ineligible concepts");

and, if so, (2) whether the claims contain an inventive concept, when the elements are considered both individually and as "an ordered combination" and thus "transform the nature of the claim into a patent-eligible application." *Id.* at 2355 (cites and quotes omitted). This test is balancing between twin goals – to avoid the preemption of "the future use of these building blocks of human ingenuity" while still protecting inventions so as not to "swallow all of patent law." *Id.* at 2354 (cites and quotes omitted).

One threshold question the Court must answer when faced with a § 101 question is whether the question is ripe for consideration. As this Court has observed, even after *Alice,* it is still "ordinarily . . . desirable – and often necessary – to resolve claim construction disputes prior to a § 101 analysis." *Loyalty Conversion Sys. Corp. v. American Airlines, Inc.*, 66 F. Supp. 3d 829, 835 (E.D. Tex. 2014) (citing and quoting *Bancorp Servs., L.L.C. v. Sun Life Assurance Co.*, 687 F.3d 1266, 1273-74 (Fed Cir. 2012); *accord Internet Patents Corp. v. Active Network, Inc.* 790 F.3d 1343, 1348 (Fed. Cir. 2015) ("the threshold of § 101 must be crossed; an event often dependent upon the scope and meaning of the claims"). Accordingly, "the Court . . . waited until after the claim construction ruling . . . in order to ensure that there [were] no issues of claim construction that would affect the Court's legal analysis of the patentability issue." *Id.* Other courts have done the same. For example, "[w]here the parties dispute the scope and meaning of the asserted claims as they do here, application of the principles governing a § 101 analysis is not a straightforward exercise," such that waiting until after claim construction is best. *Advanced Marketing Sys. LLC v. CVS Pharmacy*, Case No. 6:15-cv-134, Slip Op. at 8 (E.D. Tex. Nov. 18, 2015) (Report & Recommendation of Magistrate Judge Mitchell); *see also TriPlay, Inc. v. WhatsApp Inc.*, , Civ. A. No. 12-1703-LPS,2015 U.S. Dist. LEXIS 55068 (D. Del. Apr. 28, 2015) (Report & Recommendation of Magistrate Judge Burke) (recommending deferring ruling

on § 101 issues because:  "Neither party has briefed or addressed in detail their proposed claim constructions for these [disputed] terms, nor the legal or factual support for those constructions. . . . It strikes the Court as plausible that Plaintiffs could put forward reasonable constructions for those terms that would render the claim patent eligible").[2]  Thus, "it seems a definitive ruling on eligibility before claim construction is only warranted in narrow circumstances, making such a ruling the exception rather than the rule."  *Certified Measurement LLC v. Centerpoint Energy Houston Elec. LLC*, Case No. 2:14-cv-627-RSP, 2015 U.S. Dist. LEXIS 39821 (E.D. Tex. Mar. 30, 2015).

      **B.**    **Claims of '271 Patent are Patentable Under the Supreme Court Standard**

          **1.**    *Alice* **Part 1: The Claims are not Directed to an Abstract Idea**

In its Motion, Epic contends that the claims of the '271 Patent are directed exclusively to the abstract idea of "collecting, accessing, and managing patient medical records in a secure manner."  In so stating, Epic oversimplifies the claimed invention and wholly ignores the elements of the invention that distinguished it over the prior art – such as the two-way firewall program that allowed for different sets of "data modules" to be displayed to different sets of users.  The invention is specifically directed to solving a particular technical problem in electronic medical records – how to provide different sets of users (patients and physicians) with different sets of information drawing from the same database, while allowing for real-time editing and sharing of common portions of the information by each user group.  The '271 Patent

---

[2]   Judge Stark adopted Judge Burke's recommendations in all material respects, except that, instead of denying the motion to dismiss without prejudice as to certain claims because of the claim construction issues, Judge Stark elected to leave the motion to dismiss pending as to those claims, until after claim construction.  *See Triplay, Inc. v. WhatsApp, Inc.*, Civ. A. No. 12-1703-LPS, 2015 U.S. Dist. LEXIS 104373 (D. Del. Aug. 10, 2015); *see also Execware, LLC v. BJ's Wholesale Club, Inc.*, Civ. A. No. 14-233-LPS, 2015 U.S. Dist. LEXIS 132387 (Sept. 30, 2015) (holding that claim construction was clearly required before deciding § 101 issues where, as the Magistrate Judge's analysis had shown, the possible claim constructions and related underlying factual issues, on facts similar to those here, could affect the patentability determination).

claims a two-part solution consisting of an unconventional and custom two-way firewall program and specially programmed software that presents the distinct "data modules" to each type of user.  Further, the invention also provides a mechanism for a temporary override of the firewall so that additional information can be shared with the patient.[3]

Thus, unlike the patent in *MyMedicalRecords*, the '271 Patent is not simply applying an "age old idea" of "secure record access and management, in the context of personal health records" to a computer using routine, conventional computer components.  (Mot. at 11, citing *MyMedicalRecords, Inc. v. Walgreen Co.*, No. 2:13-CV-00631-ODW SH, 2014 WL 7339201 (C.D. Cal. Dec. 23, 2014).)  Similarly, the firewall in the '271 Patent is not a conventional firewall like the firewall in *Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, No. 13-CV-3777 AKH, 2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015).  For this reason, these cases and the others cited by Epic in its Motion (at 9-13) are inapposite.

Instead, the instant case is similar to *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), and other cases like it, in that "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."  *Id.* at 1257.   In *DDR*, the claims "specify how interactions with the Internet are manipulated to yield a desired result – a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink."  *Id.* at 1258. The system claimed in *DDR* created a "store within a store" upon clicking a hyperlink, which is not what ordinarily would occur (instead the click would take the user to the other website).  *Id.* at 1258.

---

[3]    Piecing together unrelated quotes from two different paragraphs of the Complaint, Epic claims that Preservation Wellness admitted that the '271 Patent is directed towards an abstract idea.  (Mot. at 9.)  This is both illogical and incorrect.

Similarly, here, the claims do more than what would be done conventionally by a password, which simply lets authorized users into a system, or a firewall, which simply regulates access to (and from) a system by information or programs, as well as conventional paper or electronic medical records systems.  Instead, among other things, the invention provides real-time, remote access – and editing capabilities - to parts of the same information using different interfaces specific to the user involved.  The problem solved by the '271 Patent does not exist in the world of paper records, where the medical records themselves, once created, are typically static and fixed, and look no different to each reader.  Thus, if physician notes are on the same page as other medical records, the patient would necessarily also see those notes, when she reviewed the other portions of the medical records, unless additional, unlikely steps were taken to redact the information.  Further, to the extent that notes are routinely kept separately from other medical records (whether in paper or electronically), the file history specifically discusses the advantages of the claimed system to physicians, who see their notes embedded in the same screen as other information at all times.  *See* Amendment after Final at 13, July 1, 2009 ("A treating physician or consulting physician will typically only have a brief few minutes to read and digest the patient's medical record.  There is an advantage to having the medical notes specific to the given patient appear on a physician-only access screen for that given patient.")  Thus, not only does the invention provide a technical solution to the given problem, but also the solution has real-world advantages and benefits not found in paper or electronic prior art systems.

In this regard, this case is also similar to a number of other district court cases in which the courts found that the claimed invention was directed not to a general, abstract concept, but to a specific solution to a technical problem, even if using some generic, conventional computer

elements.  *See, e.g.*, *Contentguard Holdings, Inc. v. Amazon.com Inc.*, Case No. 2:13-cv-112-JRG, 2015 WL 5853984, at *4 & *6 (E.D. Tex. Oct. 5, 2015) ("Though the Patents-in-Suit address problems associated with creating and enforcing usage rights with content, they are directed to non-abstract solutions through the use of trusted systems." "The Court does not find that all the steps or limitations in the Patents-in-Suit are purely conventional, even though they may be performed using conventional technology."); *TimePlay, Inc. v. Audience Entertainment LLC*, CV 15-05202 SJO (JCx), Slip. Op. at *8 (C.D. Cal. Nov. 10, 2015) (observing that the patent specifically stated that "the purpose of the invention is to 'ameliorate one or more of the shortcomings of existing multi-player gaming systems'"; and holding that courts should not ignore specific computer elements when determining whether the patent is directed to an abstract idea); *Trading Techs. Int'l v. CQG, Inc.*, Case No. 05-cv-4811, 2015 U.S. Dist. LEXIS 22039, at 11-12 (N.D. Ill. Feb. 24, 2015) (holding that claims were not directed toward an abstract idea and, in so arguing, defendant "ignores much of the details of the representative claims . . . the claims are directed to solving a problem that existed with prior art GUIs [graphical user interface devices]").

An example associated with USPTO 2014 Interim Guidance on Subject Matter Eligibility, Example 23, is also instructive in considering whether the claims of the '271 Patent are directed to an abstract concept.  Example 23 includes four hypothetical claims related to an invention involving graphical user interfaces (GUIs).  In Example 23, the GUI includes multiple windows that may overlap due to limited display space "and obscure the content of underlying windows.  In the instant application, the inventor has improved upon previous GUIs by dynamically relocating obscured textual information of an underlying window to become automatically visible to the user."  July 2015 Update Appendix 1: Examples at 7.  "When the

overlap condition no longer exists, the textual information is returned to its original format and location." *Id.* Example 23 includes four sample claims. The first hypothetical claim in Example 23 is instructive here because the USPTO deemed it to not be directed to an abstract concept. As the USPTO guidance explains, Claim 1 provides specific steps that occur to implement the claimed invention, including displaying a first and a second window, monitoring the window boundaries to detect the overlap condition, automatically relocating the text to an unobscured portion of the underlying window so it is visible and then returning the text to its original location once the overlap ends. The USPTO thus concluded that the claim was not abstract, because it "does not recite any mathematical concept or a mental process such as comparing or categorizing information that can be performed in the human mind, or by a human using a pen and paper. . . . Instead the claimed method is necessarily rooted in computer technology to overcome a problem specifically arising in graphical user interfaces." *Id.* at 9. The guidance also concluded that the other three example claims were all abstract, because the steps were described in a more general way and included a mathematical algorithm, *e.g.*, "calculating a scale factor," which rendered the claims to be directed to an abstract idea.[4]

In the instant case, however, no mathematical algorithms are present nor, as has been shown, is the claim comparable to what can be done by hand or the human mind. The generic description of the system – essentially an electronic medical records system, which Epic contends makes the claimed invention abstract – is too broad and ignores the details of the claimed invention. As described above, the real invention is the two-way firewall program that works with the software to display certain data modules of electronic medical records thereby providing superior user interfaces to those existing in prior art electronic or paper systems, which

---

[4]   As will be discussed below, the guidance went on to find that one of the hypothetical claims, claim 4, though directed to an abstract concept included sufficient additional details to demonstrate an inventive concept, and thus was also patent eligible. *Id.* at 11-12.

provides real-world benefits to the users of the system.   *See, e.g.,* '271 Patent, Objects and Summary of the Invention at Col. 3, ln. 61-65 ("It is a yet further object to provide the system with a firewall that permits the physician to review and edit the physician's records and the patient's record, and permits patient to review and edit his or her own medical record, but not the physician's records or those of other patients.").   The claims are also not a mere replica of "real-world" paper medical records systems or prior art electronic medical record systems and do not preempt all other paper or electronic systems.   Following applicable case law and USPTO guidance, this Court should hold that the claimed invention of the '271 Patent is not directed to an abstract concept.

### 2.    *Alice* Step 2:  The Claims do Contain an Inventive Concept

Even if the Court finds that the claims of the '271 Patent are directed to an abstract concept, the claims of the '271 patent contain an "inventive concept" sufficient to "transform" the abstract idea into a patent-eligible application.   As explained above, when properly construed, at least two elements of each claim – the "software providing data modules" and the "two-way firewall program" – are not routine, conventional computer components.   Sufficient detail is given in the patent for how each of these features work.   In this way, these components are unlike those in *Intellectual Ventures*, where the court found (distinguishing *DDR*) that the "access control system" was not an inventive concept because it did not specify "*how* the information in the packets is processed nor *how* an access rule is selected or implemented." *Intellectual Ventures,* 2015 WL 1941331, at *11.   Here, the '271 Patent details the use of a "two-way firewall program" to create separate interfaces that are transmitted to the appropriate user through the "software providing data modules."   There are extensive details on the kinds of information provided depending on the user involved, as well as what the interface should contain (*e.g.*, an editing button).   The '271 Patent further teaches how to override the firewall

temporarily.  Information also is provided that clarifies that the two-way firewall is more than a conventional password system and more than a conventional firewall or two-way firewall program (although it may adapt a conventional firewall program for this purpose).  Thus, the patent provides a particular, unconventional solution to the problem of how to provide different sets of users with different sets of information drawing from the same database, while allowing for real-time editing and sharing of common portions of the information by each user group and does not foreclose other solutions – whether electronic or in the "real world."

In this way, the instant patent is similar to that in *Contentguard*, where the court found an inventive concept even if the claimed invention was deemed to be directed to an abstract concept, because "the Patents-in-Suit disclose particular solutions for the problem of 'enforcing usage rights and restrictions on digital content' that  '(1) do not foreclose other ways of solving the problem, and (2) recite a specific series of steps that result in a departure from the routine and conventional way of managing digital rights.'" *Contentguard Holdings, Inc. v. Amazon.com Inc.*, Case No. 2:13-cv-112-JRG; 2015 WL 5853984 at *5-6 (E.D. Tex. Oct. 5, 2015) (finding that sufficient detail given about the solution to reach the conclusion that an inventive concept was present, even though all the potential details of the solution were not disclosed); *see also Trading Techs.*, 2015 U.S. Dist. LEXIS 22039 at *15-16 ("'static price axis' element of the patents in suit was an 'inventive concept,' which eliminated some problems of prior GUIs relating to speed, accuracy and usability"; this feature "allowed some traders the ability to more efficiently and accurately place trades on the electronic trading floor").

Epic's efforts to show that the claimed invention is merely putting a real world medical records system on a computer and not solving a technical problem with electronic medical

records further demonstrate the inventive concept here.  In its Motion, Epic states that the two-way firewall program operates the same as a paper filing system, explaining:

> A paper filing system for patient medical records would also require that a patient have access only to his or her medical record, and for the physician to have access to additional files such as the physician notes, and other patient files.  Moreover, a physician could give the patient temporary access to her notes by handing the paper file to the patient to review, and then taking it back again.

(Mot. at 19.)  But this does not describe the instant invention.  Admittedly, merely making medical records available on a computer could work this way, but that is not how the electronic medical record system here works – it also allows for real-time, remote editing by both patients and physicians directly into the database.  Paper records do not permit such conduct.  Further, the two-way firewall program also works with the electronic medical records to provide different interfaces to each type of user presenting different segments of the same information – a feature that can only occur in the real world if physical records are already segregated or if someone redacts the records viewed by the patient.  Further, Epic's "real world" ignores the '271 Patent's teaching of *remote* temporary access to a physician's notes or other restricted medical information through the two-way firewall.  To the extent that Epic may next contend that the patient take paper notes home and then bring them back, this argument fails as well, as it is not equal to the effect of the claimed invention.  *Contentguard*, 2015 WL 5853984 (observing that a trip to a library is not the same as the electronic restrictions on access to content of the claimed system; "a library may be able to *punish* a patron for an unauthorized usage pattern after the fact, it cannot *prevent* such unauthorized usage by a patron.") (emphasis in original); *accord Cal. Inst. Of Tec. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 994-95 (C.D. Cal. 2014) (holding that analogies to the real world not useful when considering computer inventions:  "pencil and paper can rarely produce the actual effect of the invention.").  Thus, the invention here is not simply a

computer application of what could otherwise be done by pen and paper and does not merely utilize conventional computing components; nor does it foreclose other paper or electronic ways of collecting, accessing and managing patient medical records.

As with Step 1 of the *Alice* analysis, Example 23 from the USPTO guidance is also instructive here.  Considering hypothetical claim 4, the guidance concluded that it was directed to an abstract idea, but "when viewing these computer limitations [in the claim] as an ordered combination within the remaining limitations, the claim amounts to significantly more than the abstract idea."  July 2015 Update Appendix 1:  Examples at 11.  Indeed, the USPTO found the computer elements in the hypothetical claim to be generic, but also found that:

> these claim limitations recite a specific application of the mathematical algorithm that improves the functioning of the basic display function of the computer itself. As discussed above, the scaling and relocating the textual information in overlapping windows improves the ability of the computer to display information and interact with the user.
>
> Taking all the claim elements both individually and as an ordered combination, the claim as a whole amounts to significantly more than a mathematical algorithm of calculating a scaling factor.  Thus the claim recites patent eligible subject matter.

*Id.* at 12.  Similarly here, the claims of the '271 Patent, even if deemed to include only generic computer limitations, as a whole amount to significantly more than the abstract idea of paper or electronic medical records systems.  The invention provides, for example, particular ways of presenting the medical records that "improve[] the ability of the computer to display information and interact with the user."  *Id.*  For example, physicians have all of the necessary information, including notes, on one screen, while patients can see at least a portion of their medical records from a remote location, and both can edit the underlying records in real-time.  Further, the physician can easily make her notes or other medical information temporarily available to the patient, even if the patient is in a remote location.  As explained further above, these benefits are

not achieved by traditional "real-world" paper medical records or prior art electronic medical records systems.  Thus, even if the Court were to conclude that the claims of the '271 Patent are directed to an abstract concept and do not solve a particular technological problem, the Court should nonetheless hold that the claims contain an inventive concept because each "claim as a whole amounts to significantly more" than the alleged abstract idea of electronic or paper medical records and there are other paper and electronic medical records systems that would not be preempted by the claimed invention.

### C. This Court Should Defer Ruling on Patent Eligibility Until After Claim Construction

Because Preservation Wellness has shown that it is "plausible that [it] could put forward reasonable constructions for those terms that would render the claim[s] patent eligible," *TriPlay*, 2015 U.S. Dist. LEXIS 55068 at *61, this Court should either deny the instant Motion and allow the case to proceed on its normal course, or defer any ruling on the § 101 issues until after claim construction.  Epic cannot seriously dispute that the parties disagree about the meaning of key claim terms.  While contending these claim terms do not need construction, Epic has nonetheless offered several possible constructions of "firewall." In its Motion, Epic argued that a "firewall" is "not a physical thing, but a metaphor connoting separation and impenetrability implemented by some undescribed mathematical formula."  (Mot. at 9 (quoting *Intellectual Ventures*).)  In the parties' joint letter to the Court on November 30, 2015 Epic defined "firewall" as conventional "password protection" that causes "different information [to] be available to different users depending on the password."  As explained above, neither of these constructions – which are merely attempts to pigeon-hole the term into a routine, conventional computer component – are plausible after reading the '271 Patent and its file history.  Preservation Wellness expects that Epic also will challenge the construction of the claim terms "software providing data modules,"

recited above, and "feature permitting the physician to override the firewall feature . . . for a limited time," as nothing more than routine, conventional computer components (indeed, Epic has already stated in its Motion that any reference to "software" in the claims is to a conventional computer).   The intrinsic record proves the opposite – that these terms are specific, unconventional features that defeat Epic's Motion.  Preservation Wellness has shown that it is at least plausible that the proper construction of these terms will include more than routine computer features.  Thus, for these reasons, the Court should, at a minimum, defer a definitive ruling on § 101 issues until after claim construction.  *See TriPlay*, 2015 U.S. Dist. LEXIS 55068, at *61-62; *see also Advanced Marketing Sys. v. CVS Pharmacy*, Case No. 6:15-cv-134, Slip Op. (E.D. Tex. Nov. 18, 2015); *accord Loyalty Conversion*, 66 F. Supp.3d at 835.

Indeed, Epic's cases support Preservation Wellness' position.  Notably, *Intellectual Ventures*, 2015 WL 1941331, discussed above, was a ruling on summary judgment, *after* claim construction (and the Court construed "firewall" in its summary judgment ruling).  Another case Epic relies upon, *MyMedicalRecords,* was a decision on a motion for judgment on the pleadings, *after* claim construction, *MyMedicalRecords*, 2014 WL 7339201, although the parties had agreed that only conventional computer functionality was being used and that the invention was a simple electronic medical records program.  The invention did not include anything like the "two-way firewall program" claimed in the '271 Patent.  Lastly, in *Card Verification Solutions, LLC v. Citigroup Inc.*, 13 C 6339, 2014 WL 4922524 (N.D. Ill. Sept. 29, 2014), the motion to dismiss was denied without prejudice specifically because claim construction was required.

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiff, Preservation Wellness, respectfully requests that this Court deny the instant Motion or, at a minimum, defer ruling on § 101 issues until after claim construction.

Dated:  December 23, 2015      */s/Andrew W. Spangler*_____
Andrew W. Spangler TX SB #24041960
Spangler Law P.C.
208 N. Green Street, Suite 300
Longview, TX 75601
Telephone:  (903) 753-9300
Facsimile:  (903) 553-0403
spangler@spanglerlawpc.com

Nicole D. Galli (PA SB #78420)
Law Offices of N.D. Galli LLC
2 Penn Center Plaza, Suite 910
1500 JFK Blvd
Philadelphia, PA 19102
Telephone:  (215) 525-9580
Facsimile:   (215) 525-9585
ndgalli@ndgallilaw.com

*Attorneys for Plaintiff*
*Preservation Wellness Technologies, LLC*

## CERTIFICATE OF SERVICE

    I hereby certify that all counsel of record who have consented to electronic service and are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on December 23, 2015.

                                         */s/Andrew W. Spangler*
                                         Andrew W. Spangler