IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| PRESERVATION WELLNESS TECHNOLOGIES LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 2:15-CV-1559-WCB LEAD CASE |
| ALLSCRIPTS HEALTHCARE SOLUTIONS, et al., | § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the following motions: Defendant Allscripts Healthcare Solutions, Inc.'s Motion to Dismiss Pursuant to 35 U.S.C. § 101, Dkt. No. 22; Defendant NextGen Healthcare Information Systems LLC's Motion to Dismiss Under 35 U.S.C. § 101, Dkt. No. 27; Defendant athenahealth, Inc.'s Motion for a Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c), Dkt. No. 44; and Epic Systems Corporation's Motion to Dismiss Preservation Wellness Technologies, LLC's Complaint Under 35 U.S.C. § 101, Case No. 2:15-cv-1561, Dkt. No. 16. The Court heard oral argument on the motions on March 14, 2016. The Court now GRANTS the motions and directs that the complaints against all four defendants be DISMISSED.

## BACKGROUND

The plaintiff, Preservation Wellness Technologies, LLC, ("Preservation") is the owner of U.S. Patent No. 7,640,271 ("the '271 patent"). The patent is entitled "System for Maintaining Patient Medical Records for Participating Patients." It is directed to a secure system for maintaining patient medical records, providing patients with remote access to their personal

records, and providing patient health and treatment records to the patients' medical professionals by use of a network, such as a local network a wide area network, or a global computer network (e.g., the Internet). '271 patent, col. 1, ll. 13-19. Preservation has alleged that the four defendants before the Court infringe independent claims 1 and 16 of the '271 patent and various dependent claims. The defendants have filed motions to dismiss the complaints on the ground that the claims of the '271 patent are all directed to subject matter that is ineligible for patenting under section 101 of the Patent Act.

**1. The Claims**

Claim 1 of the '271 patent recites as follows:

1. A system for maintaining patient medical records for a plurality of participating patients, and in which such records are remotely accessible by participating patients and by physicians for reading and editing of the respective patient medical records, and permitting entry of patient medical information by authorized persons, the system employing

a wide area computer network that permits communication between computer devices connected to said network, with the computer devices including

at least one patient access computer device and at least one physician access computer device;

each said computer device being suitably programmed with a web browser; and

a server including a suitably programmed computer device including means for connecting with said network,

a memory for storing said patient medical records, and

software providing data modules to each of said computer devices connected to said server over said wide area computer network, and providing to each said patient access computer device for the associated one of said participating patients a set of patient-viewable patient history screens containing a patient medical record of the associated one of said participating patients, and said server also providing to the at least one physician access computer device for each of said participating patients a set of physician-only access screens containing the physician medical record of the associated participating patient, the screens of the set of physician-only access screens being distinct from the screens of the associated set of patient-viewable screens, the physician-only access screens including medical information for said respective patient that is not provided on the patient-viewable screens, each said set being a plurality of screens; and

wherein said server also includes a two-way firewall program that allows both the associated participating patient and the physician to access the patient medical record of the associated participating patient for reading and editing, but includes

a firewall feature that allows only the physician access computer device and not the associated participating patient access computer device to access the physician-only access screens of the medical record of the associated participating patient; and

wherein at least one screen of the physician-only access screens containing the physical medical record of the associated participating patient includes at least one space for physician entry, in said space, of notes concerning symptoms, diagnosis, medical procedures performed, and/or medications prescribed for said associated participating patient by the physician.

Claim 16 of the '271 patent, which is nearly identical to claim 1, recites as follows:

16. A system for maintaining patient medical records for a plurality of participating patients, and in which such records are remotely accessible by patients and by physicians for reading and editing of the respective patient medical records of the participating patients, and permitting entry of patient medical information by authorized persons, the system employing

a wide area computer network that permits communication between computer devices connected to said network, with the computer devices including

at least one patient access computer device and at least one physician-only access computer device; each said computer device being suitably programmed with a web browser; and

a server including

a suitably programmed computer device including means for connecting with said network,

a memory for storing said patient medical records, and

software providing data modules to each of said computer devices connected to said server over said wide area computer network, and providing to each said patient access computer device for the associated one of said participating patients a set of patient-viewable patient history screens containing a patient medical record of a respective one of said patients, and said server also providing to the at least one physician-only access computer device for each of said participating patients a set of physician-only access screens containing the physician medical record of the participating patient, the screens of the set of physician-only access screens being distinct from the screens of the associated set of patient-viewable screens, the physician-only access screens including medical information for said respective patient that is not provided on the patient-viewable screens, each said set being a plurality of screens; and

wherein said server also includes a two-way firewall program that allows both the respective patient and the physician computer device to access the patient-viewable screens of the medical record of the participating patient for reading and editing, but includes a firewall feature that allows only the physician access computer device and not the patient access computer device to access the physician-only viewable screens of the medical record of said participating patient; and

wherein one screen of the set of physician-only access screens containing a physician medical record of the participating patient include at least one space for physician entry, in said space, of notes concerning symptoms, diagnosis, medical procedures performed, and medications prescribed for said participating patient by the physician.

The dependent claims mainly cover the type of information that is displayed on patient-viewable screens in the system. Those claims recite a "medications" screen (claim 2); a "visits" screen, which lists past and future medical appointments (claim 3); an "allergies" screen (claim 4); a "dietary considerations" screen (claim 5); a "family history data" screen (claim 6); a "prior illnesses" screen (claim 7); an "immunizations" screen (claim 8); a "medical diagnosis" screen (claim 9), including medical images in digital form (claim 10); an "advanced directives" screen (claim 11), including the location of a patient health proxy (claim 12), and a do-not-resuscitate order and/or an organ donation order (claim 13). In addition, the dependent claims add the following features to claim 16: a "diagnosis dialog box" on the physician-only access screen, including menus for selecting a "diagnosis nomenclature" of the patient by key word and by entry of a diagnosis code (claim 17), and for selecting a "procedure nomenclature" of the patient by key word and by entry of a procedure code (claim 18). The remaining dependent claims include one in which the two-way firewall program permits the physician to override the firewall to permit the patient for a limited time to view limited portions of the physician medical record (claim 14), and others that provide space for physician notes that do not appear on the patient-viewable screens (claims 15 and 19).

## 2. The Specification

The specification of the '271 patent states that the problem addressed by the patent is the need for easy, real-time access to patient information by the medical practitioner and the patient. '271 patent, col. 1, ll. 20-66. The specification states that what is missing from the prior art is a

patient health care records system that is easily accessed, such as from a web site or by inserting a CD-ROM into a computer, allowing the computer to access a host server, so that a patient can access his or her own medical history using a PIN or other password. According to the specification, the prior art also fails to disclose a system in which the patient or emergency room personnel can obtain a limited, read-only version of the patient's medical history without having the patient's PIN number. Finally, the specification states that prior art systems did not employ a two-way firewall program to permit the patient to read and modify his own records, but not the physician's records or those of other patients, while permitting the physician to modify both his own records and the patient's records. Id., col. 2, ll. 1-16.

The specification describes the invention as a network-based medical records storage and retrieval system that operates by means of a web browser installed in a computer. Id., col. 3, ll. 41-44. The system maintains patient medical records on a central computer server, which allows remote access to the records for reading and editing by authorized persons. Id., col. 4, ll. 20-24. A patient can access the system using a coded access means, such as a CD-ROM, which is inserted into a computer and accesses the system server via the Internet. Software providing data modules is provided to each user computer in the system. That software allows the patient to use his or her computer to obtain access to editable patient history screens. Id., col. 4, ll. 27-46.

The system also provides for physician-accessed computers programmed with a web browser and software modules containing the "physician medical record" of the physician's patient. Id., col. 5, ll. 14-27. The server includes a "two-way firewall program" that "allows both the patient and the physician to access the respective medical record for reading and editing, but allows only the physician and not the patient to access the physician medical record." Id., col. 5, ll. 27-31. The two-way firewall program has a feature that allows the physician to

- 5 -

override the firewall and send items such as test results and images to the patient.  Id., col. 5, ll. 31-40.

As recited in the dependent claims and noted in the specification, the patient history screens can include screens containing such information as a listing of medications, a listing of medical visits, dietary considerations, family history, prior illnesses, immunizations, medical diagnoses, and advance directives, such as an organ donation order.  Id., col. 5, line 41, through col. 6, line 1.  The physician's computer contains the medical history of the patient, space for entering the physician's notes, and dialog boxes for selecting a diagnosis nomenclature or a medical or surgical procedure for the patient.  Id., col. 6, ll. 6-22.

### 3. The Motions to Dismiss

Each of the four defendants has filed a motion to dismiss the complaint against it for failure to state a claim upon which relief could be granted.[1]  The motions were based on assertions that the '271 patent claims were not patent-eligible under 35 U.S.C. § 101.  Defendants NextGen Healthcare Information Systems, LLC ("NextGen") and Epic Systems Corporation ("Epic") filed substantive briefs in support of their motions.  The other two defendants, Allscripts Healthcare Solutions Inc., and athenahealth, Inc., joined, adopted, and incorporated the motions and briefing filed by other defendants.  Dkt. Nos. 22, 31, and 44.

The essence of the motions filed by NextGen and Epic is that the claims of the '271 patent are not patent-eligible because they are drawn to abstract ideas and do not contain an inventive concept.  Preservation's position, in essence, is that (1) the claims are not drawn to abstract ideas, (2) the claims contain specific inventive concepts, and (3) in any event, the

---

[1]  Three of the defendants filed their motions under Fed. R. Civ. P. 12(b)(6).  The fourth, athenahealth, Inc., filed its motion under Fed. R. Civ. P. 12(c), since it had already filed an answer by the time it filed its motion to dismiss.

Court's decision as to the merits of the defendants' section 101 arguments should await claim construction rather than being made based on the pleadings.

## DISCUSSION

### A. Applicable Legal Principles

The legal standard for determining whether a particular claim is drawn to patentable subject matter within the meaning of 35 U.S.C. § 101 is by now familiar, if not always easy to apply. Section 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." The Supreme Court has interpreted section 101 to bar the issuance of patents on "laws of nature, physical phenomena, and abstract ideas." Diamond v. Chakrabarty, 447 U.S. 303, 308 (1980).

Over the past several years, as a result of a series of decisions from the Supreme Court and the Federal Circuit, the law of unpatentable subject matter has developed to the point that it is possible to discern several governing principles applicable to cases involving "business methods" and other methods and systems for organizing human activity. The Supreme Court's 2014 decision in Alice Corp. Pty. Ltd. v. CLS Bank International, 134 S. Ct. 2347 (2014), built on the Court's analysis in the earlier decisions of Bilski v. Kappos, 130 S. Ct. 3218 (2010), and Mayo Collaborative Services v. Prometheus Laboratories, Inc., 132 S. Ct. 1289 (2012). The Alice decision, which is the Court's most recent word patent eligibility, warrants particularly close attention.

The claims at issue in Alice were drawn to a computerized system for mitigating "settlement risk," i.e., the risk that only one party to an agreed-upon financial exchange will fail to satisfy its obligation. As the Court explained, the claims were "designed to facilitate the

exchange of financial obligations between two parties by using a computer system as a third-party intermediary." Alice, 134 S. Ct. at 2352. The claims involved "a method of exchanging financial obligations between two parties using a third-party intermediary to mitigate settlement risk. The intermediary creates and updates 'shadow' records to reflect the value of each party's actual accounts held at 'exchange institutions,' thereby permitting only those transactions for which the parties have sufficient resources. At the end of each day, the intermediary issues irrevocable instructions to the exchange institutions to carry out the permitted transactions." Id. at 2356.

The Alice Court began by noting that the Court's earlier opinion in Mayo had constructed a two-step framework for determining patent eligibility for claims challenged under section 101 as based on abstract ideas. Step one, the Court explained, is to "determine whether the claims at issue are directed to . . . [a] patent-ineligible concept[]" such as an abstract idea. Id. at 2355. Step two requires the court "to consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements transform the nature of the claim into a patent-eligible application." Id. The Court described that step as "a search for an inventive concept—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." 134 S. Ct. at 2355 (citations omitted).

The Supreme Court held that the claims before it in Alice were drawn to the abstract idea of intermediated settlement. Like risk hedging, which was the activity at issue in the Court's earlier decision in Bilski, the Court held that intermediated settlement is a fundamental economic practice that qualifies as an "abstract idea" and thus is beyond the scope of 35 U.S.C. § 101. 134 S. Ct. at 2356. Both concepts, the Court held, "are squarely within the realm of 'abstract ideas'

as we have used that term." Id. at 2357. The Court then went on to determine that none of the claim elements, alone or in combination, contained the "inventive concept" necessary to render the claims patent-eligible. Quoting Mayo, the Court explained that "[s]imply appending conventional steps, specified at a high level of generality" is not enough to supply an inventive concept. Id.

On one important issue, the facts of Alice required the Court to go beyond Bilski. The claims in Bilski did not require the use of computers, while the claims in Alice did. Significantly, the Court held that introducing the use of a computer into the claims did not render the claims in Alice patentable. To the contrary, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." 134 S. Ct. at 2358. The relevant question, the Court explained, "is whether the claims here do more than simply instruct the practitioner to implement the abstract idea of intermediated settlement on a generic computer." Id. at 2359. The Court concluded that they did not, because the function performed by the computer at each step of the claims was "purely conventional." Id., quoting Mayo, 132 S. Ct. at 1298. As the Court explained, the claims before it did not "purport to improve the functioning of the computer itself, [nor did] they effect an improvement in any other technology or technical field. . . . Instead, the claims at issue amount to nothing significantly more than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer," which the Court held was not enough to render the abstract idea patentable. Id. at 2360 (quotation marks and citation omitted).

**B.  The Parties' Arguments**

Invoking the two-part Alice test, the defendants contend that the '271 claims are unpatentable because (1) the claims are drawn to the abstract idea of maintaining a system of

patient records that provides differential access by physicians and patients; and (2) the claims lack any inventive concept because the computing functionalities recited in the claims are conventional and generic.

Preservation responds that this case should not be disposed of on a motion to dismiss under Rule 12(b)(6) and that addressing the issue of patent eligibility should await the construction of several terms in the patent, particularly the terms "two-way firewall program" and "software providing data modules." Preservation argues that, properly construed, those terms show that the claims of the '271 patent are not drawn to an abstract idea and that, even if they are, they contain an inventive concept.

The question of patent eligibility is a pure question of law. Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d 1363, 1366 (Fed. Cir. 2015); In re BRCA-1 & BRCA-2-Based Hereditary Cancer Test Patent Litig., 774 F.3d 755, 758 (Fed. Cir. 2014). And the Federal Circuit has made it clear that, in appropriate cases, district courts may decide the issue of patent eligibility without first conducting claim construction. Genetic Techs. Ltd. v. Merial L.L.C., Nos. 2015-1202 & 2015-1203 (Fed. Cir. Apr. 8, 2016); OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d 1359, 1362 (Fed. Cir. 2015); Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n, 776 F.3d 1343, 1351 (Fed. Cir. 2014); buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1355 (Fed. Cir. 2014). Where it is clear that claim construction would not affect the issue of patent eligibility, there is no requirement that the court go through that exercise before addressing the eligibility issue. See Bancorp Servs., L.L.C. v. Sun Life Assurance Co., 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[C]laim construction is not an inviolable prerequisite to a validity determination under § 101.").

At the hearing on the motions to dismiss, Preservation provided the following proposed definition for the term "software providing data modules": "Software that provide distinct interfaces and data sets to system users based upon access and authorization determinations made by the two-way firewall program." Hearing Tr. 7. In addition, Preservation provided the following definition for the term "two-way firewall program": "A layer of software sitting at the middleware level (and not the user interface level) that, in a secure manner: (1) determines the user's level of system access; (2) determines the appropriate data and interfaces to display to the user; and (3) allows edits made by the user to be incorporated into the data maintained by the system." Id.

For purposes of this motion, the Court accepts Preservation's definitions as the proper construction of those claim terms. Even accepting those definitions, the Court holds that the claims are directed to ineligible subject matter. It is therefore unnecessary to await formal claim construction in order to resolve the issue presented in this motion. See Content Extraction, 776 F.3d at 1349 (Fed. Cir. 2014) (dismissal at the pleading stage proper because district court construed the claims in the manner most favorable to the plaintiff, and "even when construed in a manner most favorable to [the plaintiff], none of [the plaintiff's] claims amount to 'significantly more' than the abstract idea of extracting and storing data from hard copy documents using generic scanning and processing technology").

Following the analytical framework set forth in Alice, the Court addresses the questions whether the '271 claims are drawn to an abstract idea and, if so, whether they embody an inventive concept.

1. **Abstract Idea**

The Court is persuaded that the claims of the '271 patent are drawn to an abstract idea. The independent claims are drawn to a system for maintaining patient records that permits tiered access, including reading and editing, by physicians and patients. As such, the invention is very much in the mainstream of methods and systems for organizing human activity that have been held to constitute "abstract ideas" in the Supreme Court's decisions in Bilski and Alice as well as lower court decisions applying the two-part Alice test.

The independent claims (claims 1 and 16) are directed to computerized systems for maintaining patient medical records so that the records are remotely accessible by physicians and patients for reading and editing, with certain records accessible only to the physician. The "concept of record access and management" is an abstract idea, even as applied in the particular context of medical records. MyMedicalRecords, Inc. v. Walgreen Co., Nos. 2:13-cv-631 et al., 2014 WL 7339201, at *3 (C.D. Cal. Dec. 23, 2014) (method of collecting, accessing, and managing personal health records in a secure and private manner); see also Protegrity USA, Inc. v. Netskope, Inc., No. 15-cv-2515, 2015 WL 6126599, at *6 (N.D. Cal. Oct. 19, 2015) (claims directed to limiting access to information based on specified criteria are directed to an abstract idea); Cogent Medicine, Inc. v. Elsevier Inc., 70 F. Supp. 3d 1058, 1063 (N.D. Cal. 2014) (claims covering cataloging a database of information and culling information that may be relevant to a certain user embody "the abstract idea of maintaining and searching a library of information"); Amdocs (Israel) Ltd. v. Openet Telecom, Inc., 56 F. Supp. 3d 813, 823 (E.D. Va. 2014) ("[S]toring and querying information in a database . . . is one of the most basic functions of a database system."). Allowing for secure and private access to data has also been found to be

an abstract concept.  Card Verification Solutions, LLC v. Citigroup, Inc., No. 13-C-6339, 2014 WL 4922524, at *4 (N.D. Ill. Sept. 29, 2014).

Preservation does not deny that maintaining medical records that are differentially accessible to physicians and patients has been commonplace in the medical profession for many years.[2]  It is likewise clear that patients have frequently added to those records, for example, by contributing personal information, while physicians have typically supplemented the records by adding such items as test results and diagnostic notes.  That practice is plainly an abstract idea as that term is used in the Alice line of cases, and the introduction of computers for storing the records, providing remote access to them, and controlling access based on eligibility does not render the otherwise abstract idea any less abstract.  See Mayo, 132 S. ct. at 1301 (merely implementing an abstract idea "on a physical machine, namely a computer" is not a patentable application of that principle); Alice, 134 S. Ct. at 2358 ("the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention"); Mortgage Grader, Inc. v. First Choice Loan Servs., NYLX, Inc., 811 F.3d 1314, 1324 (Fed. Cir. 2016) (quoting buySAFE, 765 F.3d at 1354-55) ("Alice 'made clear that a claim directed to an abstract idea does not move into § 101 eligibility territory by merely requiring generic computer implementation.'").

The idea underlying the '271 patent is not meaningfully distinguishable from the "abstract ideas" found in many of the patent claims that the Supreme Court and the Federal

_____

[2]  The '271 patent itself describes several previous systems for tracking patient medical records and explains that what is lacking in those systems is computerized access to records, i.e., "a patient health care record system that is easily accessed, e.g., from a web site or by inserting a CD/ROM in a computer, whereby the computer can automatically access the host server via the Internet, and where the patient can access his or her own files by inserting a PIN or other identifying password to access the patient's own complete medical history."  '271 patent, col. 2, ll. 2-8.

Circuit have held patent-ineligible in recent years.  See Intellectual Ventures I LLC, 792 F.3d at 1367-68 & n.2  (citing and discussing numerous cases finding "methods of organizing human activity" to be abstract); see also Mortgage Grader, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (abstract idea of "anonymous loan shopping"); Versata Dev. Grp. v. SAP Am., Inc., 793 F.3d 1306, 1333 (Fed. Cir. 2015) (abstract idea of determining a price using organizational and product group hierarchies); Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 714 (Fed. Cir. 2014) ("[T]he abstract idea at the heart of the '545 patent was 'that one can use [an] advertisement as an exchange or currency.'"); Accenture Glob. Servs., GmbH v. Guideware Software, Inc., 728 F.3d 1336, 1344 (Fed. Cir. 2013) ("The abstract idea at the heart of system claim 1 of the '284 patent is 'generating tasks [based on] rules . . . to be completed upon the occurrence of an event.'").

The idea at the heart of the '271 patent is to have a network-based system manage medical records to allow patients and physicians different levels of access to the records.  The underlying idea is simply the performance of that function, not a technological solution that enables that function to be performed in a particular manner.  The limitations of claim 1, for example, are almost entirely functional in nature.  In essence, claim 1 recites a computer network that has the capacity to store patient medical records; allows the patient and the physician to access the patient's medical records for reading and editing; but allows only the physician to access certain portions of the records.

Preservation argues that the defendants' description of the abstract idea underlying the invention "ignores the elements of the invention that distinguished it over the prior art—such as the two-way firewall program that allowed for different sets of 'data modules' to be displayed to different sets of users."  Dkt. No. 26, at 8; Dkt. No. 50, at 11.  But the arguable presence of

inventive features that convert the abstract idea into a patent-eligible concrete application goes to the second part of the <u>Alice</u> test, the "inventive concept" requirement, not to the first part of the test, the "abstract idea" requirement.

The Federal Circuit made that point clear in <u>Ultramercial</u>, 772 F.3d 709. That case involved a patent on a method of distributing copyrighted media products over the Internet. The claimed method provided that a consumer would receive a copyrighted media product for free, in exchange for viewing an advertisement, and the advertiser would pay for the copyrighted content. The claim addressed by the court divided the method into 11 steps that recited the process in detail, from the receipt of the copyrighted materials from the content provider, through the sale of the product at an Internet site, through the display of the advertising to the customer (after which the customer is offered access to the product), and finally to the receipt of payment from the sponsor of the advertising message.

The Federal Circuit held that the claims in <u>Ultramercial</u> were directed to unpatentable subject matter. Following the analytical path set out in <u>Mayo</u> and <u>Alice</u>, the <u>Ultramercial</u> court first held that the recited method was directed to an abstract idea. The court explained that "receiving copyrighted media, selecting an ad, offering the media in exchange for watching the selected ad, allowing the consumer access to the media, and receiving payment from the sponsor of the ad all describe an abstract idea, devoid of a concrete or tangible application." 772 F.3d at 715. Focusing on the additional limitations in the claims, the court noted that most of them simply described "the abstract idea of showing an advertisement before delivering free content." <u>Id.</u> As for the remaining limitations, the court ruled that "the addition of merely novel or non-routine components to the claimed idea [does not] necessarily turn[] an abstraction into

something concrete." Rather, the court explained, "any novelty in implementation of the idea is a factor to be considered only in the second step of the <u>Alice</u> analysis." <u>Id.</u>

The dependent claims add nothing with respect to the "abstract idea" step. As noted above, most of them simply identify subject matter that can be contained on various patient-viewable screens in the system. Those include screens displaying patient medications, medical appointments, allergies, dietary considerations, family history, prior illnesses, immunizations, medical diagnoses, and advanced directives. The dependent claims also include one in which the two-way firewall program permits the physician to override the firewall to permit the patient for a limited time to view limited portions of the physician medical record, and others in which the physician may enter notes that do not appear on the patient-viewable screens. Those slight elaborations on the inventions set forth in claims 1 and 16 do not add enough to convert the claimed subject matter into a concrete application, rather than an abstract idea, to wit, a system for maintaining and providing tiered access to patient medical records of various types.

Preservation singles out dependent claim 14, which recites that the two-way firewall program "includes a feature permitting the physician to override the firewall feature and permit the participating patient for a limited time to view limited portions of the physician medical record for said participating patient." But that, too, is simply the computer-based equivalent of an age-old practice—a physician showing a patient certain test results or diagnostic notes. Under the standards set forth in <u>Alice</u> and the cases following <u>Alice</u>, the claims of the '271 patent are clearly drawn to abstract ideas.

## 2. Inventive Concept

The second question posed by the two-part test from <u>Alice</u> is whether there are any "additional features" in the claims of the '271 patent constituting an "inventive concept" that

would render a claim eligible for patenting even if the claim was directed to an abstract idea. Alice, 134 S. Ct. at 2357. Those "additional features" must be more than "well-understood, routine, conventional activity." Mayo, 132 S. Ct. at 1298; Ultramercial, 772 F.3d at 715.

The defendants say there is nothing in the patent that constitutes such an "inventive concept." Preservation argues that the inventive concept can be found in two specific limitations of the '271 claims: the limitations referring to the "software providing data modules" and the "two-way firewall program." Based on the definitions of those terms proposed by Preservation, however, it is clear that those limitations do not contribute any "inventive concept" that would render the claims patent-eligible.

First, the term "software providing data modules" is purely functional in character, as Preservation's definition makes clear. Preservation defines that term to refer to software that provides interfaces and data to users based on their level of authorized access to the patient medical records maintained on the system. That definition is simply a description of the abstract idea of providing patients and physicians with tiered access to patients' medical records, with no indication of how the function is to be performed. Thus, the term "software providing data modules" adds nothing to the basic function described in the patent—providing tiered access to patient medical records based on the different authorization levels for patients and physicians. That is not an innovative concept, but is simply a description of functions already set forth in the claims.

Second, the term "two-way firewall program," on which Preservation heavily relies,[3] is also largely functional in nature. Once again, Preservation's definition makes that clear.

---

[3] Preservation describes the two-way firewall program as the "real invention" of the '271 patent. Dkt. No. 50, at 16. See also Hearing Tr. 57 ("Two-way firewall program or using

Preservation defines the term as software that (1) determines the user's level of access to the system, (2) determines what data and interfaces are appropriate to display to the particular user, and (3) allows the user to make edits to the data in the system, such as by the patient entering personal information or the physician entering notes and diagnostic assessments. Those portions of the definition of "two-way firewall program" add nothing by way of an inventive concept, since they simply describe the functions set forth in the claims, without any suggestion of a novel way of performing those functions.

Preservation argues that the "two-way firewall program" in the '271 patent has at least one feature that goes beyond simply describing the functions set forth in the claims and thus provides the claims with an inventive concept. Preservation points to the portion of its definition of "two-way firewall program" in which it asserts that the program is found "at the middleware level" within the system, and not at the user interface. That feature, according to Preservation, improves the overall security of the system. Hearing Tr. 58, 65-66, 76. Although that feature is nowhere set forth in the '271 patent, either in the claims or in the specification, Preservation argues that it is an inherent feature of a "two-way firewall program."

Relying on "two-way firewall program" to provide the inventive concept when the term has no structural definition in the patent poses a significant challenge for Preservation. If the two-way firewall program has no structural definition and is defined functionally as providing tiered access for patients and physicians, then it adds no inventive concept to the abstract idea. If the firewall does have a structural definition, but that definition is so well known that it need not be described in the patent to be understood by a person of ordinary skill in the art, then that

firewall definitely adds some structure as an additional complexity, if you will, to the claim and it is that which is inventive.").

structure is simply a conventional structure that functions in a well-known manner and thus is insufficient to contribute the required "inventive concept" for purposes of section 101 analysis.

Preservation conceded at the hearing on the motions to dismiss that the two-way firewall program is a conventional computer program that was available at the time of the patent application; it was, according to Preservation, a known program for providing security for computer systems by limiting access to the system and system data. Hearing Tr. 23-24, 26, 40, 42-43, 58, 65-67, 76, 78. Thus, even if Preservation is correct that a two-way firewall is conventionally located at the middleware level in the system, the use of a two-way firewall program does not add any inventive concept to the abstract idea of a secure patient medical record system featuring tiered access and editing capability. See In re Smith, No. 2015-1664, at 5-6 (Fed. Cir. Mar. 10, 2016), citing Alice, 134 S. Ct. at 2357-58 ("appending purely conventional steps to an abstract idea does not supply a sufficiently inventive concept").

In addressing the same general issue, the Federal Circuit in Ultramercial considered whether certain conventional operations in the context of a claim to an abstract idea could constitute "'an inventive concept' to 'transform' the claimed abstract idea into patent-eligible subject matter." 772 F.3d at 715, citing Alice, 134 S. Ct. at 2351. The court noted that the claim at issue in Ultramercial contained 11 steps, but it held that those steps constituted merely "routine additional steps such as updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet," which were not sufficient to "transform an otherwise abstract idea into patent-eligible subject matter." Id. at 716. Those limitations were not sufficient to "transform the abstract idea that they recite into patent-eligible subject matter because the claims simply instruct the practitioner to implement the abstract idea with routine, conventional activity." Id. at 715. "That some of the eleven steps were not

previously employed in this art is not enough—standing alone—to confer patent eligibility upon the claims at issue." <u>Id.</u> at 716 (citations omitted).

The Federal Circuit followed a similar analytic path in <u>Content Extraction & Transmission LLC v. Wells Fargo Bank</u>, 776 F.3d 1343 (Fed. Cir. 2014), decided a month after <u>Ultramercial</u>. That case involved patents to a method of extracting data from hard copy documents using an automated digitizing unit such as a scanner, recognizing specific information from the extracted data, and storing that information in a memory. The method could be used, for example, in an automated teller machine that recognizes information on a scanned check.

The <u>Content Extraction</u> court held that the claims before it were drawn to the abstract idea of data recognition and storage, functions that have long been performed by humans. <u>Id.</u> at 1346-47. In analyzing the "inventive concept" element, the court looked to whether the claims involved "more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" 776 F.3d at 1347-48, quoting <u>Alice</u>, 134 S. Ct. at 2359. The court held that they did not. Rather, it noted, the claims merely recited the use of existing scanning and processing technology to recognize and store data from specific data fields, and that there was nothing inventive about the plaintiff's "use of a generic scanner and computer to perform well-understood, routine and conventional activities." 776 F.3d at 1348. The use of those components in a particular technological environment was insufficient to save the claims. <u>Id.</u> Because "the basic character of [the plaintiff's] claims is the abstract idea of extracting and storing data from hard copy documents using generic scanning and processing technology," the court held the patents invalid. <u>Id.</u> at 1349.

The court in <u>Content Extraction</u> also held that dependent claims that add insignificant variations did not transform the abstract idea into a patentable invention. <u>Id.</u> at 1349 (dependent

claims that may have a narrower scope than the representative claims were not patent-eligible, because "all of the additional limitations in the claims . . . recite well-known, routine, and conventional functions." The dependent claims at issue in that case closely parallel the dependent claims at issue in this case; like the dependent claims in Content Extraction, the dependent claims of the '271 patent all recite functions that are not inventive, but simply constitute specific applications of the invention, such as providing specific types of medical information on the patient access screens.

Another case similar to this one is Intellectual Ventures I LLC. There, the Federal Circuit first found that the patent claims were directed to the abstract idea of tailoring website content based on the viewer's location or the time of day when the user navigated to the website. The court then ruled that the recited "interactive interface" was not a "specific application of the abstract idea that provides an inventive concept." Noting that the patentee did not assert that it had invented an interactive interface that manages web content, the court held that the interface limitation was simply "a generic computer element" and therefore did not constitute an "inventive concept" under the second part of the Alice test. 792 F.3d at 1370-71. See also Versata, 793 F.3d at 1334 ("conventional and well-known limitations involving a computer" are not an "inventive concept"); Mortgage Grader, 811 F.3d at 1324-25 ("These generic computer components do not satisfy the inventive concept requirement"); Internet Patents Corp. v. Active Network, Inc., 790 F.3d 1343, 1346 (Fed. Cir. 2015) ("a known idea, or one that is routine and conventional, is not inventive in patent terms"); OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d at 1363 (quoting Alice, 134 S. Ct. at 2357, 2359, and Mayo, 132 S. Ct. at 1294, 1298) ("Beyond the abstract idea of offer-based price optimization, the claims merely recite 'well-understood, routine conventional activit[ies],' either by requiring conventional computer activities or routine

data-gathering steps, [which] fail 'to "transform" the claimed abstract idea into a patent-eligible application.'"). Those decisions provide strong precedential guidance for this case, which involves a known type of software program functioning in its conventional manner.[4]

A case that helps define the limits of the doctrine of unpatentable abstract ideas is <u>DDR Holdings, LLC v. Hotels.com, L.P.</u>, 773 F.3d 1245 (Fed. Cir. 2014). The claims in that case recited systems used to enable host websites to avoid losing visitors when those visitors click on an advertisement on the host site. Instead of directing the visitor to the advertiser's website, the claimed invention provided for the host to serve a composite web page to the visitor computer having the "look and feel" of the host web page, along with content based on product information from the advertiser's product catalog.

The Federal Circuit held that the patents in <u>DDR Holdings</u> were not invalid under section 101. In so doing, the court distinguished the case before it from earlier Federal Circuit cases such as <u>Ultramercial</u> and <u>Bancorp</u>. First, the court noted that the claims did not embody a fundamental economic principle or longstanding commercial practice. Rather, the court explained, the challenge of retaining website visitors was a novel one "particular to the Internet." 773 F.3d at 1257. Moreover, the court held that the claimed solution does not simply use computers to serve a conventional business purpose; instead, it "is necessarily rooted in computer technology in order to overcome a problem specially arising in the realm of computer

---

[4] Preservation has argued at several points that the two-way firewall program is being used in an unconventional manner in the '271 patent, and that it is therefore the key to the "inventive concept" of the patent claims. From the context of Preservation's remarks, however, it is clear that Preservation is simply saying that a two-way firewall program had not previously been used with a medical records access program, not that the two-way firewall program recited in the patent operates in an unconventional manner, different from a two-way firewall program generally. Hearing Tr. 18, 26. To the contrary, Preservation made clear that the two-way firewall program residing on the server performs the conventional functions of such a program. Hearing Tr. 27, 57, 65-66, 76-79.

networks." Id.  The invention entails the storage of visually perceptible elements of numerous websites and the construction of new, hybrid web pages that "merge the content associated with the products of the third-party merchant with the stored 'visually perceptible elements' from the identified host website." Id.

The DDR Holdings court distinguished Ultramercial on the ground that the claims in DDR Holdings did not "broadly and generically claim 'use of the Internet' to perform an abstract business practice," but instead specified "how interactions with the Internet are manipulated to yield a desired result." Id. at 1258.  Moreover, the court observed that the claims at issue included a specific way to automate the creation of a composite web page and did not preempt "every application of the idea of increasing sales by making two web pages look the same." Id. at 1259.  In short, DDR Holdings dealt with a patent that required doing something to a web page, not simply doing something on a web page, a difference that the court regarded as highly important to the issue of patent eligibility.  That is not the case here.  The patent in this case is not directed to the solution of a "technological problem," Alice, 134 S. Ct. at 2358, quoting Diamond v. Diehr, 450 U.S. 175, 178 (1981), nor is it directed to an improvement in computer and network functionality.  Instead, it is directed to a function that is performed by the use of generic computer components operating in their conventional manner.

What Preservation's "inventive concept" argument comes down to is this:  Preservation asserts that its "inventive concept" is the use of a conventional computer program—a two-way firewall—in a manner that, by Preservation's own admission, is the way a two-way firewall is conventionally used, to achieve a purpose that, again by Preservation's admission, is the purpose that the two-way firewall is intended to serve.  Preservation argues that its invention resides in the novelty of using a two-way firewall program in a system for managing medical records.  But,

as the Federal Circuit explained in <u>Ultramercial,</u> if the patent "merely instructs the practitioner to implement the abstract idea with 'routine, conventional activit[ies],'" that is "insufficient to transform the patent-ineligible abstract idea into patent-eligible subject matter."  772 F.3d at 716, quoting <u>Mayo</u>, 132 S. Ct. at 1298.

In the context of a patent that is clearly drawn to an abstract idea—securely managing medical records and providing patients and physicians with differential access to those records— the use of the conventional two-way firewall program for its intended purpose to serve the function set forth in the claims does not satisfy the "inventive concept" requirement of <u>Alice</u> and the Federal Circuit decisions that have followed <u>Alice</u>.  Accordingly, the Court concludes that, based on the governing principles laid down by the Supreme Court in <u>Alice</u> and by the Federal Circuit in numerous cases following <u>Alice</u>, the claims of the '271 patent are not drawn to patent-eligible subject matter under 35 U.S.C. § 101.  The motions to dismiss are therefore GRANTED, and the complaints in each of the four consolidated cases are hereby DISMISSED.

IT IS SO ORDERED.

SIGNED this 9th day of May, 2016.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE